UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ANTONIO RODRIGUEZ,

       Plaintiff,                                        Hon. Gordon J. Quist

v.                                                          Case No. 1:08-CV-716

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/


## REPORT AND RECOMMENDATION

       This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

       Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## **PROCEDURAL POSTURE**

Plaintiff was 48 years of age at the time of the ALJ's decision. (Tr. 23). He earned an Associate's Degree in Engineering Design and worked previously as a restaurant worker, salesperson, assembler, machine operator, supervisor, and construction laborer. (Tr. 89, 98, 465).

Plaintiff applied for benefits on February 11, 2005, alleging that he had been disabled since March 23, 2001, due to injuries suffered in an automobile accident. (Tr. 76-78, 83, 92-93, 443-46). Plaintiff's applications were denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 26-76, 447-52). On August 29, 2007, Plaintiff appeared before ALJ William Decker, with testimony being offered by Plaintiff and vocational expert, Randall Ward. (Tr. 460-517). In a written decision dated November 28, 2007, the ALJ determined that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 14-25). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 5-8). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on September 30, 2007. (Tr. 16). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must

establish that he became disabled prior to the expiration of his insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## **RELEVANT MEDICAL HISTORY**

On March 23, 2001, Plaintiff was struck by an automobile while walking across a road. (Tr. 152, 156). A CT scan of his head revealed no evidence of "acute intracranial injury." (Tr. 216). X-rays of Plaintiff's pelvis revealed "diastasis of the left sacroiliac joint and symphysis pubis." (Tr. 215). A CT scan of Plaintiff's abdomen and pelvis revealed a fracture of the right half of the sacrum. (Tr. 212). This examination also indicated that L4 and L5 were "minimally displaced" due to transverse process fractures. (Tr. 212). X-rays of Plaintiff's cervical and dorsal spine were unremarkable. (Tr. 200, 210). Plaintiff suffered fractures of the right tibia and fibula. (Tr. 198). He also suffered fractures of the clavicle and scapula, as well as dislocation of the left knee. (Tr. 196-97). An MRI of Plaintiff's right knee revealed "complete tears of the anterior cruciate and medial collateral ligaments, with associated tear of the posterior horn of the lateral meniscus." (Tr. 195). Plaintiff underwent several surgical procedures and was discharged to Mary Free Bed Rehabilitation Hospital on March 30, 2001. (Tr. 145-225). Plaintiff was discharged home on April 17, 2001, in stable condition. (Tr. 225-26).

On May 11, 2001, Plaintiff participated in a follow-up examination at Mary Free Bed. (Tr. 244-45). Plaintiff reported that he was "doing well" and that "his pain is significantly improved." (Tr. 244). Plaintiff reported that he was no longer taking prescription pain medication, but was instead "just takes enteric-coated aspirin occasionally for mild pain." (Tr. 244). An

examination revealed median nerve paresthesias in Plaintiff's left hand, but was otherwise unremarkable. (Tr. 244-45).

On August 8, 2001, Plaintiff underwent arthroscopic reconstruction surgery on his left knee, performed by Dr. James Bakeman. (Tr. 246-59). On August 23, 2001, Plaintiff was examined by Dr. Bakeman. (Tr. 299). Plaintiff reported that he was "comfortable." (Tr. 299). The doctor observed that Plaintiff's stability was "really quite good" and that he was "neurologically intact." (Tr. 299). The doctor reported that Plaintiff "can full weight bear" with a leg brace. (Tr. 299).

On September 6, 2001, Plaintiff was examined by Dr. David Bielema. (Tr. 297). Plaintiff reported that he was "doing reasonably well, but still has some restriction of shoulder motion" that was being addressed in physical therapy. (Tr. 297). Plaintiff reported that he was experiencing "no pelvic discomfort" and x-rays revealed "a healed [right] hemipelvis and symphysis." (Tr. 297).

On October 31, 2001, Plaintiff underwent surgery, performed by Dr. Bielema, to better facilitate union of his right tibial fracture. (Tr. 260). X-rays of Plaintiff's right tibia, taken on November 8, 2001, revealed "satisfactory overall position and alignment." (Tr. 295). During a December 6, 2001 examination, Plaintiff exhibited "fine" range of motion and "satisfactory" strength. (Tr. 294). X-rays revealed "fine consolidation." (Tr. 294). Dr. Bielema instructed Plaintiff "to begin working on strengthening now." (Tr. 294).

Treatment notes dated January 2, 2002, reveal that Plaintiff was doing "very nicely" and was instructed to continue strengthening exercises without restriction. (Tr. 294). Treatment notes dated January 17, 2002, reveal that Plaintiff "ambulates reasonably well." (Tr. 293). X-rays

of Plaintiff's right lower extremity, taken on March 7, 2002, revealed "good consolidation at [the] tibial shaft." (Tr. 293). Dr. Bielema instructed Plaintiff that "he can resume his full activities, but is to work on [range of motion] and strengthening as instructed." (Tr. 293). Plaintiff was cleared to return to "light duty" work. (Tr. 293).

On June 6, 2002, Plaintiff was examined by Dr. Bielema. (Tr. 291). Plaintiff exhibited "full r[ight] hip motion and his knee and ankle motion [were] fine, as well." (Tr. 291). X-rays of Plaintiff's right lower extremity revealed "a healed r[ight] tibial shaft" and "a healed r[ight] hemipelvis injury." (Tr. 291).

Treatment notes dated February 19, 2003, indicate that Plaintiff "is doing well." (Tr. 289). On April 2, 2003, Dr. Bakeman reported that while Plaintiff experiences difficulty ambulating, "there is nothing that limits his use of his upper extremities." (Tr. 283). Accordingly, the doctor concluded that Plaintiff could perform "a sit down job." (Tr. 283).

On March 18, 2004, Plaintiff was examined by Dr. Bielema. (Tr. 282). Plaintiff reported that he was experiencing "aching discomfort in his leg, knee, back and hip." (Tr. 282). Plaintiff reported that he was taking ibuprofen to control his symptoms and no longer used a cane to ambulate. (Tr. 282). He also reported that he "hasn't been participating in rehab lately." (Tr. 282). The doctor noted that during his examination, Plaintiff was "somewhat demonstrative about his discomfort level, although he sat calmly in no apparent distress prior to the exam." (Tr. 282). The results of the examination, including x-rays, were unremarkable. (Tr. 282). Dr. Bielema concluded that Plaintiff was suffering from deconditioning and instructed Plaintiff to participate in either physical therapy or rehabilitation therapy. (Tr. 282). The doctor concluded that Plaintiff was capable of performing "sit-down work with a sit-stand option." (Tr. 282).

On April 14, 2004, Plaintiff participated in a CT scan of his brain, the results of which revealed no evidence of acute abnormality, intracranial mass, or hemorrhage. (Tr. 308).

On August 12, 2004, Plaintiff was examined by Dr. Darryl Varda. (Tr. 309-10). Plaintiff reported that he was experiencing "episodic headaches. . .which come at a variable frequency." (Tr. 309). Plaintiff indicated that he sometimes experiences headaches twice in one week and at other times "may go two to three weeks without a headache." (Tr. 309). Plaintiff reported that "most of the time" he obtains "rather prompt relief" by taking Excedrin or Aleve. (Tr. 309). Plaintiff walked with an antalgic gait, but exhibited "normal" coordination and "intact" sensation. (Tr. 310). Plaintiff exhibited "normal" strength in his upper and lower extremities. (Tr. 310). Plaintiff was prescribed Depakote as a means to help prevent his headaches. (Tr. 310).

On August 27, 2004, Plaintiff received a sacroiliac joint injection. (Tr. 339). Plaintiff received "good relief" from this treatment. (Tr. 338). Plaintiff received another such injection on January 7, 2005. (Tr. 337).

On March 12, 2005, Plaintiff's fiancée, Karen Calligaris, completed a report concerning Plaintiff's activities. (Tr. 106-13). Calligaris reported that Plaintiff folds laundry, dusts, vacuums, washes dishes, prepares meals, cares for their two cats, drives a car, visits friends, and shops. (Tr. 106-10). Calligaris also reported that Plaintiff writes, performs arts and crafts, plays board games, watches television, and plays pool. (Tr. 110). Calligaris reported that Plaintiff can lift 10-15 pounds and walk one-quarter to one-half-mile. (Tr. 111). She further indicated that Plaintiff follows instructions "very well" and experiences no attention deficits or difficulties. (Tr. 111).

On March 18, 2005, Plaintiff reported that he was "doing quite well with pain control." (Tr. 336). Plaintiff reported that he was participating in pool therapy and "has been more active." (Tr. 336).

On March 29, 2005, Dr. William Schirado completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 343-57). Determining that Plaintiff suffered from post-traumatic stress disorder and anxiety, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) Section 12.06 (Anxiety-Related Disorders) of the Listing of Impairments. (Tr. 344-52). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for these particular Listings. (Tr. 353). Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and never experienced episodes of decompensation. (Tr. 353).

Treatment notes dated September 16, 2005, indicate that Plaintiff continues to experience "fairly chronic" pain for which "he does get intermittent relief with injection therapy and the use of medication." (Tr. 369). The doctor reported that Plaintiff was unable to perform "unrestricted" work, but did not indicate whether Plaintiff could perform restricted work. (Tr. 369).

X-rays of Plaintiff's cervical, thoracic, and lumbar spine, taken on March 20, 2006, revealed no evidence of acute abnormalities. (Tr. 427-28). There was evidence of "relatively minor" degenerative changes of the cervical spine. (Tr. 428). There was also evidence of L5 spondylolysis without spondylolisthesis. (Tr. 428).

On November 30, 2006, Plaintiff participated in an electrodiagnostic study of his upper extremities, the results of which were "normal" with "no [evidence of] slowing in the median

8

or ulnar nerves on either side." (Tr. 414). Plaintiff exhibited "good strength" and "[t]here was no Tinel's sign over the cubital or carpal tunnels." (Tr. 414).

On December 27, 2006, Plaintiff was examined by Dr. Kevin Fitzgerald. (Tr. 367). Plaintiff reported he was experiencing right-sided hip pain. (Tr. 367). Plaintiff exhibited "full range of motion" in his hips, knees, and ankles. (Tr. 367). Palpation of the SI joint produced tenderness, but straight leg raising was negative. (Tr. 367). The doctor recommended that Plaintiff receive another SI joint injection and resume participating in physical therapy. (Tr. 367).

Plaintiff was examined by Dr. Fitzgerald on June 29, 2007. (Tr. 432). Plaintiff exhibited "limited" range of motion in his hips, knees, and ankles, as well as tenderness over the sacroiliac joint area. (Tr. 432). Straight leg raising was negative and Plaintiff exhibited "no evidence of any gross sensory deficit." (Tr. 432). The doctor diagnosed Plaintiff with sacroiliac joint dysfunction. (Tr. 432).

X-rays of Plaintiff cervical spine, taken on August 28, 2007, indicated "rather mild bony spurring changes," but otherwise revealed "no significant abnormalities." (Tr. 437). An MRI examination of Plaintiff's cervical spine, performed the same day, revealed "mild diffuse spondylosis. . .with no neural compressive abnormality." (Tr. 438).

At the administrative hearing, Plaintiff testified that he can stand and/or sit for 15 minutes each before he needs to change position. (Tr. 490-91). Plaintiff reported that he can occasionally lift 20 pounds and frequently lift 10 pounds. (Tr. 492). Plaintiff testified that he was unable to work because he must lie down for four hours each day. (Tr. 492-93). Plaintiff reported that he likes to sing, write poetry, and go to garage sales. (Tr. 494-95). Plaintiff reported that he

9

washes laundry, mows the lawn, washes dishes, drives, shops, reads, watches television, and attends church. (Tr. 495-97).

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

### B. The ALJ's Decision

The ALJ determined that Plaintiff suffered from the following severe impairments: (1) left knee arthrofibrosis status-post reconstruction, (2) a history of right ankle tibia-fibula fracture,

---

[1] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

(3) lower back pain status-post vertebral fractures, (4) spurring of the cervical spine, (5) migraine headaches, and (6) right sacroiliac joint dysfunction. (Tr. 17). The ALJ further determined, however, that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 17-18). The ALJ concluded that while Plaintiff was unable to perform his past relevant work, there existed a significant number of jobs which he could perform despite his limitations. (Tr. 18-25). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ's Decision is Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff is capable of performing sedentary work activities, subject to the following limitations: (1) he cannot lift more than 10 pounds, (2) he requires a sit-stand option that allows him to change positions every fifteen minutes, (3) he can occasionally climb ramps and stairs, (4) he can never climb ladders, ropes, or scaffolds, and (5) he can only occasionally balance, stoop, kneel, crouch, or crawl. (Tr. 18). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff was unable to perform his past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Randall Ward.

The vocational expert testified that there existed approximately 18,800 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 473, 500-11). This represents a significant number of jobs. *See Born v. Sec'y*

*of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988).

### a. The ALJ Properly Evaluated the Medical Evidence

On August 27, 2007, Dr. Heather Bunting submitted a statement in which she asserted that Plaintiff "would have difficulty, primarily due to his chronic pain, with working on a consistent basis for eight hours a day." (Tr. 440). The doctor further stated that Plaintiff would "need to change his position in a typical workday from sitting to standing." (Tr. 441). Plaintiff asserts that because Dr. Bunting was one of his treating physicians, the ALJ was required to accord controlling weight to such. Plaintiff further asserts that the ALJ failed to give sufficient reasons for rejecting Dr. Bunting's opinions.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Accordingly, the medical opinions and diagnoses of treating physicians are given substantial deference, and if such opinions and diagnoses are uncontradicted, complete deference is appropriate. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

Nonetheless, the ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*,

13

839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

As the Sixth Circuit has clearly held, when an ALJ chooses to accord less than controlling weight to the opinion of a treating physician, he must adequately articulate his rationale for doing so. *See Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544-47 (6th Cir. 2004). As the *Wilson* court held:

> If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors - namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source - in determining what weight to give the opinion.
>
> Importantly for this case, the regulation also contains a clear procedural requirement: "We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion." A Social Security Ruling explains that, pursuant to this provision, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Id.* at 544 (internal citations omitted).

As the *Wilson* court further held, failure to comply with this requirement is not subject to harmless error analysis. *Id.* at 546-47. As the court expressly stated:

> A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely. . .To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with § 1527(d)(2), would afford the

14

> Commissioner the ability [to] violate the regulation with impunity
> and render the protections promised therein illusory.

*Id.* at 546 (internal citations omitted).

Contrary to Plaintiff's assertion, the ALJ discussed at length his rationale for discounting Dr. Bunting's opinion. (Tr. 22-23). Moreover, substantial evidence supports the ALJ's decision in this regard. With respect to Dr. Bunting's August 2007 statement, the ALJ observed

> The deposition statement of August 2007 is persuasive that the claimant certainly has significant limitations in his ability to work; however, it ultimately does not convince the undersigned that the claimant is unable to perform substantial gainful activity on a regular and sustained basis. A careful review of the statement simply indicates that the claimant has chronic pain issues, has a limited ability to lift and carry items and would need to change his position. The claimant's statement at hearing that he requires a sit/stand option every 15 minutes is included in the residual functional capacity.

(Tr. 23).

As the ALJ also recognized, Dr. Bunting's opinion, to the extent that it is inconsistent with the ALJ's RFC determination, is contradicted by objective medical evidence and the opinions by Plaintiff's other treating physicians. (Tr. 18-23). Dr. Bielema cleared Plaintiff to return to "light duty" work in March 2002. In April 2003, Dr. Bakeman concluded that Plaintiff could perform a "sit down job." In March 2004, Dr. Bielema reported that Plaintiff could perform "sit-down work with a sit-stand option." These opinions are consistent with the objective medical evidence, as well as Plaintiff's reported activities. In sum, substantial evidence supports the ALJ's decision to discount Dr. Bunting's opinion. Furthermore, the ALJ articulated sufficient reasons for doing so.

b. The ALJ Properly Evaluated Plaintiff's Credibility

The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible." (Tr. 22). Plaintiff asserts that the ALJ failed to give proper weight to her subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added). As the relevant Social Security regulations make clear, however, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531. This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 2004 WL 1745782 at *6 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's

16

subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations not to be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

As the ALJ correctly concluded, to the extent that Plaintiff alleges that he is limited to an extent beyond that recognized by the ALJ's RFC determination, such is contradicted by the observations and conclusions of Plaintiff's treating physicians, the objective medical evidence, and Plaintiff's reported activities. The Court finds, therefore, that there exists substantial evidence to support the ALJ's credibility determination.

c. The ALJ Properly Relied on the Vocational Expert's Testimony

Plaintiff asserts that the ALJ relied upon the response to an inaccurate hypothetical question. While the ALJ may satisfy his burden through the use of hypothetical questions posed to

a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996).

The hypothetical question which the ALJ posed to the vocational expert simply asked whether there existed jobs which an individual could perform consistent with Plaintiff's limitations, to which the vocational expert indicated that there existed approximately 18,800 such jobs. Because there was nothing improper or incomplete about the hypothetical questions he posed to the vocational expert, the ALJ properly relied upon his response thereto.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, the undersigned recommends that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: July 24, 2009          /s/ Ellen S. Carmody
                             ELLEN S. CARMODY
                             United States Magistrate Judge